# RECORD IMPOUNDED

## NOT FOR PUBLICATION WITHOUT THE
## APPROVAL OF THE APPELLATE DIVISION

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2012-24

S.T.,

    Plaintiff-Respondent,

v.

K.T.,

    Defendant-Appellant.

_____

Argued June 3, 2026 – Decided July 8, 2026

Before Judges Mayer, Paganelli and Vanek.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Mercer County, Docket No. FV-11-1461-24.

Patricia L. Veres argued the cause for appellant (Einhorn, Barbarito, Frost, Botwinick, Nunn & Musmanno, PC, attorneys; Patricia L. Veres and Bonnie C. Frost, on the briefs).

Wendy M. Rosen argued the cause for respondent (SeidenFreed LLC, attorneys; Wendy M. Rosen, of counsel and on the brief; Neethi Vasudevan, on the brief).

PER CURIAM

Defendant K.T. (Kate) appeals from a January 15, 2025 final restraining order (FRO) entered against her pursuant to the Prevention of Domestic Violence Act (PDVA), N.J.S.A. 2C:25-17 to -35.[1]  Kate also appeals from a February 26, 2025 order awarding plaintiff S.T. (Steve) attorney's fees and costs in the amount of $32,690.  We affirm.

On March 19, 2024, Steve filed a verified complaint for a temporary restraining order (TRO) under the PDVA.  Steve alleged he and Kate were married.  Further, he alleged they have a son, Sam, who at the time of application for a TRO was almost twenty-two years old.  Steve alleged Kate committed terroristic threats, harassment, and cyber harassment through a multitude of text messages and emails she sent to him over several months.  He also alleged Kate committed past acts of domestic violence against him.  The court entered the TRO, which included Sam as a protected party.

On March 22, 2024, Steve moved to amend the TRO to include additional text messages and emails from Kate.  The court entered an amended TRO (ATRO).  On May 8, Steve filed a supplemental certification along with a

---

[1]  We use pseudonyms to protect the domestic violence victim's privacy.  R. 1:38-3(d)(10).

request for a second ATRO to include contempt as a predicate act. He alleged Kate had been served with the ATRO and violated the ATRO by communicating with him and Sam. In addition, Steve made additional allegations concerning Kate's emails, sent after the issuance of the restraining orders, but before she had been served. Further, he included additional allegations concerning Kate's prior history of domestic violence. The court entered the second ATRO, continuing Sam as a protected party.[2]

During the trial on Steve's domestic violence complaint, the court admitted into evidence numerous exhibits that evidenced Kate's communications. Because we presume the parties are familiar with these exhibits, we need not recite every communication sent by Kate to Steve. We note generally the communications included statements that: Steve murdered Sam "by dragging him for [a C]ovid va[ccination]"; Steve "deserve[d the] death penalty"; Steve "physical[ly] abuse[d]" Sam and "damaged his brain and reduced his genetic life expectancy"; Steve "mentally and emotionally abus[ed]" Sam; Steve is a "monster and . . . deserve[d] to spend the rest of [his] life behind bars for chronic abuse and neglect"; Steve "tortur[ed] and arrest[ed Sam] from 2008-2013"; because of Steve, Sam had "multiple arrests . . . by [the] FBI" and

---

[2] We refer to the ATRO and the second ATRO collectively as the "ATROs."

Sam was "brutalized" at parties; Steve deserved to be put "behind bars"; Steve is a "vil[]e psychopath, emotional child abuser"; Steve "restrain[ed]" Sam from saving "baby turtles and homeless puppies" and "chain[ed Sam] to [a] violent gaming station"; Steve "lack[ed] common sense," and had "harass[ed]," "hunt[ed]," and "intimidate[d]" Sam and was an "evil re[***]d"; Steve was a "hor[r]ific criminal and subhuman evil father" (capitalization modified); Kate "should have let [her father] kill" Steve; Steve was a "subhuman abusive monster"; and Kate "wish[ed Steve's] mother . . . had [the] opportunity to abort" him. One communication included an attachment from a movie, where a son killed his father, and Kate stated that "is what [Steve] deserve[d]." Many of these communications included third parties. Moreover, Kate emailed Steve to "confirm that [the restraining order] was delivered to [her] today." Nevertheless, she continued to email Steve.

In addition, the court admitted prior court orders, from 2015 and 2018, that were entered in the parties' divorce proceeding. In part, the 2015 order required Kate "to cease [from] disparaging [Steve] to . . . [Sam] and involving [Sam] in the parties' disputes" and "limit[ed Kate]'s communication with [Steve] to one email or text per day, except in emergent circumstances where the health and welfare of . . . [Sam] is at risk." In part, the 2018 order granted Steve's

4

"application for an order enforcing the . . . 2015 order restricting [Kate] from sending more than one email or text per day" and "restrain[ed Kate] from making harassing and threatening email and text communications to [Steve] . . . and requir[ed Kate]'s communications only be about" Sam.  The 2018 order denied, without prejudice, Steve's "application for an order sanctioning [Kate for] . . . harassing and threatening communication[s] if [Kate]'s texts and emails to [Steve] . . . continue . . . but the [c]ourt . . . cautioned [Kate] to cease these harassing communications."  (Emphasis added).

Steve and Kate testified on their own behalf during the domestic violence trial.  Regarding Steve's testimony, the trial court found he "was [not] attempting to [be] dece[ptive]," "obstructionist," or "evasive" and answered questions "directly."  In addition, the court found Steve "stood up to cross-examination well."  The court found Steve to be credible.

Concerning Kate's testimony, the trial court found her "testimony credible . . . in the sense that she did not deny sending all of the communications."  However, the court determined her testimony did not stand up to scrutiny on a number of events.  Further, the court found she "did not answer directly, was evasive, [and] at times did not even read [back her statements when] . . . she was . . . asked to read with the exact words."

5

The trial court placed its decision on the record. The court recited the correct burden of proof and noted Steve bore that burden. The court established jurisdiction, finding Steve and Kate were married, had lived together, and have a child together.

The court considered Steve's allegations concerning the predicate acts of harassment and contempt.[3] The court reviewed the relevant case law concerning harassment. Regarding harassment, the court found Kate's "communications . . . certainly involved subjects other than legitimate concerns." Further, it found the "narrative" was about Steve being "a physically abusive husband[ and w]as endangering the welfare of [Sam] in any number of ways." In addition, the court determined that because Kate sent one of the emails to third parties, it was an "invasion of [Steve's] privacy with regard to how he" was described.

The trial court stated it could "glean" Kate's intent to harass Steve from her refusal to obey the orders entered in 2015 and 2018. The court concluded the 2015 order required Kate to "cease disparaging [Steve] to . . . [Sam] and involving [Sam] in the parties' dispute." Further, the court found the 2015 order

---

[3] The trial court determined Steve did not establish the predicate acts of terroristic threats or cyber harassment. Because Steve has not filed a cross-appeal from the court's conclusions regarding these predicate acts, we need not consider them.

limited Kate "to one email or text per day except in emergent circumstances where the health and welfare of . . . [Sam wa]s at risk." The court also determined the 2015 order concerned Kate's "manner of communication" and Steve's "desire to have it stopped." The court found Kate's "refusal to [stop] . . . with knowledge that [Steve] wants these types of communications to stop" supported a finding of an intent to harass.

Further, the court noted in the 2018 order, Kate was "restrain[ed] . . . from making harassing and threatening email and text communications to [Steve] . . . and requir[ed Kate]'s communications only be about" Sam. The court determined the 2018 "provision . . . [wa]s violated in almost every communication from 2018 where [Kate] carrie[d] forward this narrative about . . . [Steve's] abuse of . . . [Sam and] abuse of her in any myriad of circumstances."

In addition, the trial court found evidence that Kate's communications were "numerous" and went "far beyond just vulgar name calling" to include calling Steve a "murderer," "genetic scum," and other "denigrating names" and included "threats that [Sam] should have killed" Steve or Steve "should be going to jail."

7

The trial court added that Steve testified that "since 2020 . . . there have been approximately 3,000 communications." Further, the court found there were "threats and . . . alarming conduct" including "the police showing up at [Steve]'s residence on two occasions in 2024, coupled with [Kate's] threats that he should be arrested both in Florida and in New Jersey for endangering [Sam's] . . . welfare."

The trial court found "[t]here can be no justification for . . . [Kate's] repetitive, ongoing, disparaging behavior and they would constitute harassment." The court determined Kate's communications included "coarse or offensive language or [were] otherwise likely to cause annoyance or alarm."

The trial court considered "the surrounding circumstances" and "prior history" in its analysis of harassment. The court found "it's really been one continuing stream" that had "ramped up in 2023 and 2024." The trial court stated Steve testified to "feel[ing] fear" because he did not "know what [Kate] might do" and the court found Kate does not comply with court orders. The court concluded Steve had established harassment under N.J.S.A. 2C:33-4(a) and (c).

Concerning contempt, the trial court found Kate had been served with the restraining orders. Nevertheless, even acknowledging "being fully aware" that Steve had obtained a restraining order, Kate communicated with Steve, Sam,

8

and included a third party on an email. Because Kate included the third party, the court determined there was "an invasion of privacy." The court concluded "clearly" the evidence "reflect[s] that [Kate wa]s aware of the restraining order[ and] continue[d] to have communication with" protected parties, including Sam.

The trial court noted the 2015 and 2018 orders permitted limited, albeit non-harassing, contact. Further, it found some of the communications included ordinary information and did not "include any narrative directed to" Steve. However, the court concluded Kate's emails, after being served with the restraining orders, constituted contempt and it accepted Kate's testimony "that she continually communicates with [Sam] who's a protected party."

Next the trial court considered whether there was a prior history of domestic violence. The court concluded Kate's violation of the 2015 and 2018 orders "constitute[d] prior history." Moreover, the court found a prior history based on Kate's "repetitive narrative disparagement regarding circumstances or events that . . . don't appear to be supported by the evidence and . . . just appear to be [her] manifestation of . . . anger . . . [with] the purpose to alarm, annoy[,] or intimidate."

Moreover, the trial court determined an FRO "is clearly needed to prevent . . . reoccurrence." The court found "[t]here's no indication that [Kate] will stop,

not [even] by compliance with the [2015 and 2018] orders." The court concluded Kate's behavior "would [not] stop without" an FRO, noting she had not stopped the behavior even after the ATROs were entered. In addition, the court determined Kate's "harassing behaviors [we]re being used to try to coerce . . . conduct or action by [Steve] that coalesces or coincides with [her] beliefs." The court concluded an FRO was "needed to prevent further abuse."

The trial court included Sam as a protected party in the FRO. The court determined there was evidence that Kate "having access to [Sam] would present a risk of harm to" Steve. The court found Kate "encouraged, agreed with and has otherwise disparaged" Steve to Sam. The court stated Sam could "make [an] application to be removed as a protected party as there was no physical or mental impediment for him to do so."

After obtaining an FRO, Steve moved to have his attorney's fees paid by Kate. On February 26, 2025, in a written decision accompanying an order, the trial court granted Steve's request for attorney's fees, finding the attorney's certification complied with the requirements of Rule 4:42-9(b) and Rules of Professional Conduct 1.5(a). The court determined the hourly rate charged was "reasonable and in accord with fees customarily charged." The court also found "[t]he services rendered and resultant fee award were the direct result of an act

of domestic violence resulting in" an FRO. The court adjusted the trial preparation time downward and reduced the requested fee accordingly. The court awarded attorney's fees in the amount of $32,690.

On appeal, Kate argues Sam should not be included in the FRO and by including him, the trial court "stripp[ed] . . . [her and Sam] of their right to a mother-son relationship, potentially forever." Further, Kate contends the facts at trial were insufficient to support a finding of harassment or contempt. In addition, she asserts her last non-contemptuous communication was soon after being served with the ATRO and thus, Steve does not need the protection of an FRO because there is no immediate danger or need to prevent further abuse. Moreover, she contends because the FRO must be vacated, the award of Steve's attorney's fees should similarly be vacated. Lastly, she argues, even if the FRO is affirmed, the fees awarded were unreasonable because the FRO hearing was "unnecessarily extended by cumulative evidence" and the manner in which Steve's evidence was presented to the court.

"We review the Family Part judge's [factual] findings in accordance with a deferential standard of review, recognizing the court's 'special jurisdiction and expertise in family matters.'" Thieme v. Aucoin-Thieme, 227 N.J. 269, 282-83 (2016) (quoting Cesare v. Cesare, 154 N.J. 394, 413 (1998)). Therefore,

"findings by the trial court are binding on appeal when supported by adequate, substantial, credible evidence." Id. at 283 (quoting Cesare, 154 N.J. at 411-12). Deference is particularly proper "when the evidence is largely testimonial and involves questions of credibility." Cesare, 154 N.J. at 412 (quoting In re Return of Weapons to J.W.D., 149 N.J. 108, 117 (1997)).

"[W]e do not pay special deference to its interpretation of the law . . . . [T]he trial court is in no better position than we are when interpreting a statute or divining the meaning of the law." Thieme, 227 N.J. at 283 (second alteration and omission in original) (quoting D.W. v. R.W., 212 N.J. 232, 245 (2012)). Thus, "we review the trial court's legal conclusions de novo." Ibid. (quoting D.W., 212 N.J. at 245-46). Moreover, "a 'trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference.'" Manahawkin Convalescent v. O'Neill, 217 N.J. 99, 115 (2014) (quoting Town of Kearny v. Brandt, 214 N.J. 76, 92 (2013)) (internal quotation marks omitted).

When determining whether to grant an FRO, "where the jurisdictional requirements have otherwise been met," a trial court must conduct two inquiries. Silver v. Silver, 387 N.J. Super. 112, 125 (App. Div. 2006). "First, the [court] must determine whether the plaintiff has proven, by a preponderance of the

credible evidence, that one or more of the predicate acts set forth in N.J.S.A. 2C:25-19(a) has occurred." Ibid. The statute includes the predicate acts of harassment, and "[c]ontempt of a domestic violence order." See N.J.S.A. 2C:25-19(a)(13), (17).

Harassment is defined under N.J.S.A. 2C:33-4 in pertinent part as follows:

> [A] person commits a petty disorderly persons offense if, with purpose to harass another, he [or she]:
>
> a. Makes, or causes to be made, one or more communications anonymously or at extremely inconvenient hours, or in offensively coarse language, or any other manner likely to cause annoyance or alarm;
>
> . . . .
>
> c. Engages in any other course of alarming conduct or of repeatedly committed acts with purpose to alarm or seriously annoy such other person.

An essential element of harassment, purpose to harass, is often difficult to prove by direct evidence, so "'purpose may and often must be inferred from what is said and done and the surrounding circumstances[,]' and '[p]rior conduct and statements may be relevant to and support an inference of purpose.'" R.G. v. R.G., 449 N.J. Super. 208, 226 (App. Div. 2017) (alterations in original) (quoting State v. Castagna, 387 N.J. Super. 598, 606 (App. Div. 2006)). "'A

finding of a purpose to harass may be inferred from the evidence presented' and from common sense and experience." H.E.S. v. J.C.S., 175 N.J. 309, 327 (2003) (quoting State v. Hoffman, 149 N.J. 564, 577 (1997)).

"[C]ourts must consider the totality of the circumstances to determine whether the harassment statute has been violated." Cesare, 154 N.J. at 404 (citing Hoffman, 149 N.J. at 584-85). "This is particularly true in domestic violence cases in which a cycle of violent behavior is evident." Hoffman, 149 N.J. at 585. Behavior that may not alarm or seriously annoy a non-victim of domestic violence, "may [be] rightly view[ed] . . . as seriously annoying, alarming, or threatening, or as all of those things" by some victims of domestic violence. Id. at 586.

We have held a "[p]laintiff was entitled to submit evidence of the past violations of . . . matrimonial restraints, [to] . . . support the claim that defendant engaged in acts of harassment." N.B. v. S.K., 435 N.J. Super. 298, 307-08 (App. Div. 2014). Indeed, "[t]hat evidence explains why the recipient would be alarmed or seriously annoyed by the communications." Id. at 308.

Contempt is defined under N.J.S.A. 2C:29-9(b)(1) as when a "person purposely or knowingly violates any provision in an order entered under the provisions of the" PDVA. A person acts "purposely" if he or she consciously

14

engages in conduct or causes a certain result. N.J.S.A. 2C:2-2(b)(1). A person acts "knowingly" if he or she is aware of his or her conduct, the circumstances surrounding his or her conduct, or of a high probability that those circumstances exist. N.J.S.A. 2C:2-2(b)(2).

To support the finding of knowing or purposeful contempt, a defendant need not "personally acknowledge the legal implications of his [or her] conduct." State v. S.K., 423 N.J. Super. 540, 547 (App. Div. 2012). However, "the evidence must allow at least a reasonable inference that a defendant charged with violating a restraining order knew his [or her] conduct would bring about a prohibited result." Ibid.

"Second, if a court finds a predicate act occurred, 'the [court] must determine whether a restraining order is necessary to protect the plaintiff from future danger or threats of violence.'" T.B. v. I.W., 479 N.J. Super. 404, 412-13 (App. Div. 2024) (quoting D.M.R. v. M.K.G., 467 N.J. Super. 308, 322 (App. Div. 2021)); see also J.D. v. M.D.F., 207 N.J. 458, 475-76 (2011) (explaining that an FRO should not be issued without a finding that relief is "necessary to prevent further abuse") (emphasis omitted) (quoting N.J.S.A. 2C:25-29(b)). "[T]he Legislature did not intend that the commission of one of the enumerated

predicate acts of domestic violence automatically mandates the entry of a domestic violence restraining order." Silver, 387 N.J. Super. at 126-27.

A court

> may issue an order granting . . . the following relief:
>
> . . . .
>
> An order restraining the defendant from making contact with the plaintiff or others, including an order forbidding the defendant from personally or through an agent initiating any communication likely to cause annoyance or alarm including, but not limited to, personal, written, or telephone contact with the victim or other family members, or their employers, employees, or fellow workers, or others with whom communication would be likely to cause annoyance or alarm to the victim.
>
> [N.J.S.A. 2C:25-29(b)(7) (emphasis added).]

"In proceedings in which complaints for restraining orders have been filed," a court may enter "[a]n order requiring the defendant to pay to the victim monetary compensation for losses suffered as a direct result of the act of domestic violence." N.J.S.A. 2C:25-29(b)(4). "Compensatory losses shall include . . . reasonable attorney's fees, court costs . . . ." Ibid. "An award of counsel fees in a domestic violence proceeding requires no special showing, as an award is a form of 'monetary compensation' under N.J.S.A. 2C:25-29(b)(4)."

N.G. v. J.P., 426 N.J. Super. 398, 422 (App. Div. 2012) (citing McGowan v. O'Rourke, 391 N.J. Super. 502, 507 (App. Div. 2007)).

Appellate review of a trial court's decision granting or denying counsel fees "will be disturbed only on the rarest occasions, and then only because of a clear abuse of discretion." In re A.D., 259 N.J. 337, 351 (2024) (quoting Rendine v. Pantzer, 141 N.J. 292, 317 (1995)). Abuse of discretion "arises when a decision is 'made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis.'" Flagg v. Essex Cnty. Prosecutor, 171 N.J. 561, 571 (2002) (quoting Achacoso-Sanchez v. Immigr. & Naturalization Serv., 779 F.2d 1260, 1265 (7th Cir. 1985)).

Applying this well-established law, we conclude there is no merit to Kate's arguments. Under N.J.S.A. 2C:25-29(b)(7), an FRO can include other family members, such as Sam. We add Kate has used Sam as a cudgel against Steve throughout her communications. Under these circumstances there was no error including Sam in the FRO. We add, based on the record before us, Sam can move to be removed from the FRO and re-establish communication with Kate at his discretion.

Moreover, the trial court correctly found Kate's communications established a history of domestic violence, were harassing, and in contempt of

17

the ATROs.  Kate's assertion to the contrary is belied by the facts in the record. Further, the court correctly found that an FRO was necessary to protect Steve from further abuse.  Kate's suggestion—that the FRO was not needed because she has not communicated since her contemptuous communication—misses the mark.  Indeed, the FRO should not be vacated merely because it has effectively stopped Kate's behavior.  Instead, the FRO should remain in place to prevent the return of her prior behaviors.

Lastly, the PDVA allows for the award of attorney's fees and the trial court conducted the correct analysis in awarding fees.  We reject Kate's argument that the amount of trial evidence presented unnecessarily prolonged the trial and supported the denial of fees entirely or, alternatively, a further reduction in the amount of fees awarded.  We conclude the trial court did not abuse its direction in awarding fees after determining the reasonableness of the requested fees and the legal time spent by Steve's attorney.

Affirmed.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

*M.C. Hanley*

Clerk of the Appellate Division